The next argument is in Appeal No. 07-1005 Eurodif SA v. United States Mr. McCarthy, good morning. Welcome to you. Please proceed. Good morning. Thank you, Your Honor. May it please the Court, this is a very narrow but very important appeal. Under the Supreme Court's decision in Vermont Yankee at 435 U.S. at 524, pursuant to the Supreme Court's language, commerce should enjoy wide discretion. Mr. McCarthy, I read the briefs very carefully. I don't find it at all helpful to have generalizations about broad discretion at the Commerce Department. The holding of the three-judge panel of the trade court was that the statute governing administrative reviews can't apply in this case. So it's not a matter of discretion or options available to commerce, at least in the view of the decision we're reviewing. They said there was no option available because the language of the statute precluded it. So quoting broad generalizations out of Vermont Yankee doesn't respond to the rationale of the Court below. With all due respect, Your Honor, the three-judge panel was deciding an interlocutory appeal of four certified questions. And the question at issue that's germane here is the question as to whether a SWOO contract provides for the sale of goods or the provision of services. The Court held, under certain criteria, based on the contracts on the record of that investigation, that the contracts in those cases were substantially identical to the contracts that the Court considered in Florida latent power, and that, therefore, there was a provision of services and not subject to the anti-dumping law. We accept that. For purposes of this appeal, we fully accept that holding. The issue is we did not read anything in this Court's decision to mandate how commerce is to administer the anti-dumping law following that. The Court below held, I think, that Congress has already made the decision and that a scope review or a scope inquiry is a possible way to test whether a future shipment of uranium would fit under the decisions finding no duties applicable. So it seems to me you have to address the statute. You can't get by by simply arguing about the details of the contracts in those cases. Your Honor, with all due respect to the Port of Ashtray, the use of the scope inquiry is utterly futile in this context. Well, you say that over and over in your brief. It's not at all clear to me that it's true. As I understand it, you have a year before liquidation to begin with, and it can be extended further by the Secretary of Commerce in certain exigent circumstances. So why it would be futile? If there's some reason to suspect that a particular shipment represented to have been under a service contract actually wasn't a service contract, it's a lie, that it actually was a goods contract, a normal sale of a physical item, then you have a year before the liquidation has to occur. And even if the year passes and you haven't been able to finish showing the fraud, the fraud statute has no limitation period. So I don't see how the government is left in a position where it's futile if they're being ripped off. It doesn't look futile at all to me. Your Honor, because the scope inquiry will be initiated following the entry. The scope inquiry will be applied prospectively. It will not be able to suspend the actual entry being liquidated. You already have a year. Do you not? But it won't be suspended, Your Honor. It won't need to be suspended. It won't be able to capture. It will not capture the prior entry. It will only be a specific determination regarding an entry that will not be subject to the scope inquiry. It will not be subject to suspension. Under the plain language of the regulation, it is forward-looking. The suspension cannot occur until on or after the date of initiation of the scope inquiry. The scope inquiry will be initiated, as your defense admits at its brief, but will be initiated after the entry. The only way you can get suspension of entries at the time of entry is through an administrative review. And we read nothing in this Court's decision to suggest that an administrative review would be precluded. Using the certification process imposed by the Court of National Trade allows the importer to basically opt out of the whole entire anti-dumping law. Commerce, customs rather, as this Court recognized in Erickson, is not responsible for scope, the administration of scope inquiries, scope determinations. Commerce's customs law would be subject to entirely different standards. Furthermore, this is a complex issue involving legal facts, legal application of facts. I'm just trying to understand the portion of your argument that says it would be futile, it would never work, it couldn't work. I'm not with you yet. I don't see why it couldn't ever work. Scope inquiries are supposed to make generalized application. Is this product within or without the scope? And future entries will know that this product is within or without the scope. We're talking about a case-by-case analysis of an entry. Is this contract actually a smooth contract? Did the transactions actually reflect? Did the performance of the contract actually occur? This is a fact-specific inquiry. Do you have entry facts? I understand it's fact-specific, but I don't understand why it would be futile. Because entry acts will occur on January. Commerce initiates a scope inquiry in March. It decides that entry acts, say, without the scope. It can't suspend entry acts because that entry has not been suspended. It can only be suspended at the time of entry if Commerce has an administrative review. As this Court has repeatedly observed, administrative reviews are retrospective. A scope inquiry is not retrospective. The regulation clearly provides that the suspension occurs at the date of initiation, which means that it's already too late. The scope inquiry will never be able to capture that prior entry back. So we could say we have a scope inquiry that may— Let me ask you a hypothetical because I'm not getting any progress here. I'm not getting any traction. If I enter a shipload of uranium that's been enriched in France, and I'm the importer, and I tell Customs or Commerce or other agents of the government this was produced under a service contract, here's the contract. You can see yourself. Clause 407 makes it clear that it was for service, not goods. Now, so far, what's the problem for the government? The problem is we don't know if the parties actually followed the terms of that provision. The other thing about this is what the street judge panel did. If the contract says that I'm buying the service of enrichment for a million dollars a pound, what more is there to determine? What about if in reality they didn't follow the terms of the contract and they had another transaction? Well, why do you care? I suppose they only got paid half that much. What does that matter to the government? Because if in reality, pursuant to this Court's three-judge panel decision, the Jalopnik decision, if in fact title did transfer, if in fact there was an indicia of sale, then if there was a transfer in title, in reality, no one would deny it. That sounds like a case of outright fraud, that the contract that's for services wasn't the real deal. The real deal was a secret deal for the sale of physical items. And then the fraud statute would apply, wouldn't it? It may not be fraud. How could it not be fraud? If I import it and I tell the government it's a service contract, here's the contract, but that's not the contract we actually followed, the contract we actually followed not being disclosed to the government, later turns out to be a contract for goods, I don't see how there can be any conclusion except that it's fraud. It's probably criminal fraud as well as civil fraud, so the government is not without remedies. These are complex arrangements. They may in good faith believe that there wasn't a sale, but once Congress really should have the discretion to decide this, once they look at the facts, then they may well be services, but they may be a deviation such that there would have been a transfer of title. This court's three-judge opinion looked at the contracts on the record of the investigation and simply made an analogy to the contracts that were issued with no leg power. We cannot speculate as to what future transactions are going to look like, what future contracts are going to look like. A future contract may look substantially different from Florida Light and Power, but Congress needs to have a mechanism to examine that, and Congress is in charge of administering the anti-dumping law and making scope determinations as this court held in Erickson. I see I've exceeded my time. Thank you. I guess we have next Mr. Hochberg. Yes, ma'am. Please, the court, I'd like to reserve two minutes of my time for rebuttal. I will ultimately address the question you've raised with the government, but let me tell you about the two issues that we're raising on appeal. Contrary to the concerns of our opponents, we're not trying to undermine or reopen the three-judge panel decision. We're trying to get clarified with regard to two factual situations that we believe at present render the imports not sales of services, but sales of goods. The first is whether or not the natural uranium component, the raw materials, were sold to the U.S. utility purchaser by an affiliate of the enricher, the French enricher. The scope amendment that Congress adopted in the second remand determination made clear that if the enricher itself- Where did that uranium come from? From the utility? The uranium, if it was sold by an affiliate of the foreign enricher, it would have come from the mines of the affiliate. That is, it may be in another country. So it never came from the affiliate? We're arguing that if the affiliate sold to the utility, the natural uranium, indeed there's some reason to think there might even be integrated authors so that they would combine the two in some way. But in that circumstance, that is not what the Federal Circuit panel conceived of as a sale of services. It didn't address that issue, and we're asking the court to clarify that if, in fact, there is that kind of integrated transaction- If a utility sends uranium, unenriched uranium, to the enricher, who enriches it and sends it back, the enricher has performed a service. That is what the court held, yes. That's the prior case. We're not disputing that. Now you've got the affiliate thrown in, and you're arguing a sale between the affiliate and the enricher. No, a sale between the affiliate and the utility. The affiliate of the enricher, their mine partners, they negotiate a combined arrangement that says to the U.S. utility, we'll sell you the natural uranium- So you're saying the affiliate sells to the- U.S. utility. Utility. And that's the uranium- And where does the uranium come from before it got to the affiliate? What country? No, what party? The utility. Did it come from the utility? Yeah, no, from the affiliate. The affiliate- Where did the affiliate get it from? It was a mine. The affiliate is a company that mines uranium. In other words, it never came from the- It was never in the physical possession of the utility. Never came from the utility. No, it was never in the physical possession of the utility. But we agree that if the utility goes to a third-party source for the uranium and then supplies that uranium to the enricher, then under the panelist's decision, that's a sale of the service. But, Mr. Hochberg, this is a hypothetical. It's a hypothetical case. It's not the facts of this case. There are no facts in this case that show that an affiliate was involved. No, what is happening now is if you reject the government's appeal, then the scope exception that Congress adopted will apply to all future imports. And what we're saying is, since that would be the governing rule for all future imports, that Congress ought to have the discretion if, in fact, in a future import, there was a negotiated deal where there was an interlinked transaction. That is not a pure sale of services. Are you asking for an advisory opinion then? That's a good—excuse me. Are you asking for an advisory opinion? No, we're asking you to interpret the Federal Circuit panel's decision as applied to the scope exemption that the Congress department came up with pursuant to the second reading. For the purpose of future cases if they arise. Well, it's trying to define the meaning of what the Federal Circuit said was a sale of services. For instance, in our second example, the second concern we have, is what if the utility never delivers uranium to the enricher? The contract says it should. It never does. The fiction that the enricher is performing a service on the customer's raw materials is evaporating. It's not even a fiction because, in fact, if the natural uranium isn't delivered until after the LEU is produced and imported, there is no possible fiction that the enricher was performing a service on the utility. I understand that, Mr. Hochberg, but just to follow up on Judge Lowry's question, but those facts don't exist in this case. What you're arguing is that this should be set up so that it doesn't happen in the future. We're concerned that the scope exclusion, which was adopted by Congress in its remand determination after the CIT rejected the approach that Ms. McCarthy was saying should be adopted, that they're defining what is outside the scope of the dumping law and dumping order, and we're saying they shouldn't exclude the kinds of transactions where there might be interlinked sales of uranium and enrichment. But if your client and the government both say they're not resisting the result in this specific case, where exactly is our jurisdiction to hear this appeal about what ought to be happening? Because you are now reviewing the order, the scope exception, scope exclusion, that Congress developed pursuant to the remand that this Court sent back to the CIT. This Court sent back to the CIT and said, you've got to exclude sales pursuant to service transactions. So Congress had a struggle with what is a sale pursuant to a service transaction that meets the Court's criteria. And we believe the two issues we have raised are consistent with the Court's criteria and should be reflected in the scope exclusion that the Commerce Department adopted. If it doesn't, then there may be no ability for the Commerce Department in a future interlinked transaction to be able to say, no, wait a second, that's not within the scope exclusion. And so that's why we're raising that issue. Let me just say, well, I'd like to reserve, I have a few minutes left, but I'd like to reserve that for rebuttal. Thank you, sir. Thank you. Mr. Rosen, I think we're hearing next from you. Thank you, Your Honors. May it please the Court, this is the fourth time that the SWU import issue has come before this Court, and this Court has properly determined that SWU imports are outside the countervailing duty law as well as the dumping law. So we have a perfect record. We believe so, Your Honor. Given that the dumping statute operates only with respect to subject merchandise, and that this Court has determined that SWU imports are outside the scope of the law, those imports are not subject merchandise. Mr. Rosen, I understand the government to be saying, well, that's fine if they're truly SWU imports, but maybe there'll be some transactions in the future that wouldn't be legitimate SWU imports, or there would be fraud. And we, the government, have to be able to investigate that and make that determination, and the only way we can do that is through an administrative review. If I might, Your Honor, the SWU certification procedure that was established by the Commerce Department for this case was determined by the department to be sufficient to enable customs to determine at the time of entry whether, in fact, there was a SWU import. It is a certification that is more rigorous than anything I have ever seen from the government. It requires a copy of the SWU order and the SWU contract. It requires a documentation of the amount of feed delivered by the utility, and that the utility has title to the feed delivered. It requires the quantity of LEU produced pursuant to the SWU order, and that the order and that the production conforms to the order. But the argument the government makes in its brief is, well, it might be a lie. All those documents might be a lie, and we should be able to investigate and determine whether it's truthful or not. I have two responses to that, at least. Number one, it would require the lie of the importer. But most importantly here, the certification requires the signature of the purchaser, the utility as well. So you've got another party on the hook, which is far different from virtually any certification case. Does the certification require any kind of disclosure, or does it ask the questions that would permit a determination as to whether, in fact, the affiliate owned the uranium and another affiliate enriched it? The certification requires a statement by the importer and by the purchaser that the feed was owned by the utility, not by the affiliate. That gets us into when it owns the feed and so forth, because there's a whole timing issue in this case that we haven't really talked about. Right. The certification does not go into the original source of the feed, which is irrelevant under the UraDeef decision. So an affiliate of the enricher could in fact have provided the uranium or title to the uranium to the utility. Absolutely. And that would, in your view, that would still be a SWOO contract. Absolutely, Your Honor. And even in this investigation, from the outset of the investigation, our clients disclosed that in certain instances an affiliate had sold feed to certain of its customers. And Commerce, in analyzing the transactions, treated the transactions as SWOO transactions. The original source of the feed is not relevant under the UraDeef decision. Once the utility purchases the feed, it can use it in a particular enrichment transaction. It can sell it. It can swap it. It can hold it in inventory. It's not connected to the enrichment transaction. So if, just for the sake of the argument, one company owns the uranium and is the enricher, and sells the uranium to the utility sort of as a sale and lease back, you hold this while we're enriching it with the other hand, does the enrichment, and then sells it back, that's a valid SWOO contract under the anti-dumping law in your view? I'd have to go through the facts a little more closely, but it sounds like that was a linked transaction where the feed was being sold for the particular enrichment transaction. And therefore it would be a sale of goods and not services?  In fact, during the investigation, there was a contract where both the feed and the enrichment and the SWOOs were provided by our clients, and that was treated as the sale of LEU, not the sale of SWOO, because they were related. And how does Customs sort out the difference between a linked transaction and a not linked transaction at the border? In the documentation, the SWOO contract is presented. Well, first I would say that Commerce itself regarded the prior ownership of the feed as irrelevant. Commerce rejected USAC's request that an additional requirement be grafted upon the exclusion to focus on the original source of the feed. But the certification documents require that the contract be performed in accordance with its terms, and if any other feed was involved, that that feed be disclosed to Commerce. So it sounds like you're saying that the existing certification and other procedures already can discriminate between a legitimate work unit service versus a sale of uranium where title passes. I believe so, Your Honor, and I believe that that's exactly what Commerce said. It said that the certification procedure it had devised was sufficient to enable Customs to determine at the time of entry that this was a SWOO transaction. Well, but Ms. McCarthy argues that what actually occurred might be different from what the contract called for, and that Commerce needs the time and mechanisms to look behind the surface of the transaction to be sure that the terms as set forth in the contract are what actually occurred. First of all, Your Honor, the SWOO transaction is virtually completed at the time of entry, unlike the typical scope exclusion situation where some future act is required to determine whether in fact the exclusion is appropriate. Indeed, in this case, Commerce fashioned an exclusion for imports of LEU for purposes of conversion and fabrication and re-export within 18 months. Those imports are not subjected to administrative review or suspension of liquidation. It's by no means certain that the import will be in fact fabricated or in fact re-exported within 18 months. There are a host of cases where an exclusion is based on future use, whether it's an electronics item, photographic paper, wire rods, polyvinyl. Well, I didn't understand her to be arguing about future events. I understood her to be suggesting something about past events, that namely there was actually a sale of a physical object even though the papers that accompanied the entry said it was a service contract. Yes, Your Honor, and I think you put your finger on it. Where you have the certification of the importer as well as the utility, that this is a SWOO transaction, you'd be looking at fraud in that circumstance. Moreover, as you know. Yeah, but she argues, if I understand it correctly, that unless an administrative review is permitted, there will be no practical way that Commerce could look behind the certification papers to see if fraud was being committed in a way that could result in duties being imposed where fraud was in fact found. As you noted, that's what a scope proceeding could do, and Commerce's regulations indicate that those proceedings should take 120 days, well before the normal one-year period for liquidation, which in any event can be extended. And if fraud or negligence is involved, the statutes allow customs to reach back with respect to entries. There are also criminal penalties that are applicable here. Her argument seems to be dependent on the idea that certification isn't enough, fear and incentives aren't enough, that there also needs to be an opportunity to investigate whether the true facts correspond to the contract and the other certification documents. And our point, Your Honor, is why here? With respect to this fight we've been having for six and a half years, where this Court has spoken clearly and definitively that SWOO imports are outside the scope of the law. But she's not challenging that. She's saying legitimate SWOO transactions don't get duties, but if they're phony, they should be subject to verification, and then if shown to be phony, there should be duties. We agree that phony transactions should not be challenged. But she says she can't get there without the administrative review, that the scope review won't suffice. She is seeking a procedure in this case, after all we've been through, that differs from commerce's routine practice in a host of cases and in this case, and this in the face of decisions which say that SWOO imports are not subject to the law. All we are asking for is equal and non-discriminatory treatment. Not an opportunity to obey the law. Compared to whom? Compared to commerce's routine application of the antiductic statute. In the electronics cases, in the photo paper cases, in the wire rod cases, in the polyvinyl alcohol cases, in live swine cases, all of those cases operated with or without certifications, and without conducting administrative reviews and requiring suspension of liquidation. That's all we want. All right. Thank you. Ms. Fisher. Good morning, Your Honors. I would just like to address a couple of points. First, commerce must be required to treat this Court's decisions as binding. And second, commerce cannot continue to impose- The first proposition is not in doubt. You don't need to spend any time on that. I'm just surprised that below, commerce has said repeatedly at the agency level and at the Court of International Trade that this Court's decision of narrative is not binding on it. And we want to make sure that the Court makes very clear to commerce that it cannot continue to flaunt this Court's decisions and must apply them in the circumstances where they are applicable. I don't understand what you're asking for. Some kind of advisory ruling that if a certain thing happens in the future that the law will be X? No, just merely that this Court's decisions are stare decisis and must be applied by commerce. Well, that's already in the law. That isn't so because we would say it's so in this opinion. That's already in the law. I agree. Well, then what is it you're asking us to do? You've spent half your time on a non-issue. Okay. Your Honor, thank you. I will proceed. The other claims that have been addressed by commerce, that somehow that the parties would enter into sham transactions and try to evade the procedure set up for the certification. Certainly there's a long history of utilities contracting for enrichment services separately contracting for uranium feed with various suppliers. There are multiple suppliers around the world. It's the utilities who decide what feed goes with what services contract and at what point in time. The kind of situations that the government and USEC are raising are claims of circumvention. There are circumvention procedures. This Court and the Court of International Trade has dealt with circumvention cases and polyvinyl alcohol is a perfect example where parties restructured the transactions to try to get around the scope of an order. In this case, commerce has remedies to deal with those kinds of situations. It does not require the burden of ongoing administrative reviews where the ongoing suspension of liquidation and the chilling effect on the utility's ability to enter into non-subject school contracts would be impaired on an ongoing basis. And that's something that the Court needs to take into account. And the statute, of course, does not permit the Congress to impose those restrictions. Thank you. Ms. McCarthy, you have some rebuttal time? Or if it's actually, yeah, you do. Thank you, Your Honor. Very briefly, these are very complicated transactions. They're not black and white. We're actually not talking about sham transactions. Our concern is a good faith belief in the part of the importer and an erroneous certification in good faith. That would escape the application of civil penalty statutes because we would have to show negligence, gross negligence, fraud, just even to recover the duties under 19 U.S.C. 1592D. We have to establish a violation of the statute. They could, in good faith, consistent with the legislative history of the Mott Act, get an opinion by the attorney. This is a smooth contract. They, in fact, may be wrong. They may, in fact, once Congress looks at the record, they may, in fact, ban a transfer of ownership consistent with this court's three-court jury-judge opinion. We're simply asking for some workable, administrable mechanism by which we can ensure that there is not importers opting out of the anti-dumbing law. Whatever decision Congress makes will be subject to administrative review and judicial review by the Court of National Trade or by this Court, if necessary. The certification procedure is subject to no review except for the extreme cases of fraud. Meanwhile, a lot of anti-dumbing duties are escaping payment. And that's to no one's benefit. Thank you. Thank all four attorneys. We take the appeal under advisement. You have a minute, you thought? I think you do. I think you have one minute. I just want to make a point, and I think it's an important one. Mr. Rosen said to you, why is this case different from the other cases? Let me tell you why it's different. This is the first time that courts have held that how one structures a transaction affects whether or not the anti-dumbing law applies. That has very profound implications. And so it is of concern. Well, what's your point? This panel can't re-decide what the prior panels held. I agree with that. But with regard to what the government is arguing and what we have suggested as the need for a procedure to ensure that entries aren't liquidated before the Commerce Department has a chance to review it, the issues of whether or not a transaction involves a service transaction under the panel's decision is a complicated one. It's not like all the other cases where it's a question of the size of the import, whether the shape of the import, the ultimate use of the import, whether these or those issues can be determined by customs, because they're easily factually determined questions. This case raises, for the first time, when you re-read the decision of the panel, you will appreciate what was the panel thinking about the outer limits of what's a service transaction here, and where does this become a goods transaction. And what we're saying is that is the kind of determination when you're applying it to specific transactions and specific imports that commerce needs an opportunity to review. It's not a question of believing them. All right. I think we have your point and your time has expired. We'll take the appeal under advisement.